**UNITED STATES of America,**
**Plaintiff,**

v.

**INTERNATIONAL LONGSHOREMEN'S**
**ASSOCIATION, AFL–CIO, et al.,**
**Defendants.**

**No. 68 Civ. 3900.**

United States District Court
S. D. New York.

Oct. 16, 1968.

Ramsey Clark, Atty. Gen., of the United States, Washington, D. C., for plaintiff (Edwin L. Weisl, Jr., Asst. Atty. Gen., Civ. Division, and James Greilsheimer, Washington, D. C., Robert M. Morgenthau, U. S. Atty., and Lawrence Vogel and Michael D. Hess, Asst. U. S. Attys., New York City, Harland F. Leathers, Stephen M. Truitt, Attys. Dept. of Justice, Washington, D. C.).

Waldman & Waldman, New York City, for defendants unions (Louis Waldman, and Martin Markston, New York City, of counsel).

Constantine P. Lambos and James A. Flynn, New York City, for New York Shipping Assn., and others.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RYAN, District Judge.

This cause having come on for hearing on the application of plaintiff, the United States of America, for a preliminary injunction, as prayed for in its verified complaint, and the Court having considered all evidence submitted herein, the pleadings, memoranda of law, and argument of counsel, makes the following Findings of Fact and Conclusions of Law with respect to said application:

### FINDINGS OF FACT

1. On September 30, 1968, collective bargaining agreements between the defendant unions (International Longshoremen's Association, AFL–CIO, Atlantic Coast District, ILA, South Atlantic and Gulf Coast District, ILA), hereinafter referred to as the defendant ILA, and the defendant employers (or associations by which such employers are represented in collective bargaining conferences) who are (1) steamship companies or who are engaged as operators or agents for ships engaged in service from or to Atlantic and Gulf Coast ports from Searsport, Maine, to Brownsville, Texas, or from or to other ports of the United States or its territories or possessions, (2) contracting stevedores, (3) contracting marine carpenters, or

(4) other employers engaged in related or associated pier activities, and certain of their employees represented by the ILA, were due to expire. Despite intensive negotiations unresolved labor disputes threatened to result in a strike or lock-outs by the defendants, which strike or lock-outs would idle all members of the defendant ILA on the Atlantic and Gulf Coasts.

2. On September 30, 1968, the President of the United States acting under the provisions of Section 206 of the Labor-Management Relations Act, 1947 (29 U.S.C. § 176) (hereinafter referred to as the "Act"), issued Executive Order No. 11431 (33 F.R. 14697), whereby he appointed a Board of Inquiry to inquire into the issues in said labor disputes. In said Executive Order, the President expressed the opinion that such disputes had resulted in a threatened strike affecting a substantial part of the maritime industry, an industry engaged in trade, commerce, transportation, transmission or communication among the several States and with foreign nations, and which threatened strike would, if permitted to occur, imperil the national health and safety.

3. On October 1, 1968, 12:01 a. m., negotiations having failed to resolve said labor disputes, the defendant ILA went on strike at all ports along the Atlantic and Gulf Coast.

4. The Board of Inquiry appointed by the President convened on the morning of October 1, 1968, and inquired into the issues involved in the disputes, and on the same day rendered its written report to the President.

5. After receipt of the report, the President, on October 1, 1968, directed the Attorney General, pursuant to the provisions of Section 208 of the Act, to petition in the name of the United States any district court of the United States having jurisdiction of the parties to enjoin the continuance of such strike and for such other relief as may be necessary or appropriate.

6. Thereupon, on October 1, 1968, the Attorney General brought this action under the National Emergencies provisions of the Act (Section 206-210) on behalf of the United States of America against the following named defendants, to wit:

The New York Shipping Association,

Portland Shipping Association,

Providence, Rhode Island, Shipping Association,

The Steamship Trade Association of Baltimore, Inc.,

The Boston Shipping Association, Inc.,

The Philadelphia Marine Trade Association,

The Hampton Roads Maritime Association, Inc.,

South Atlantic Steamship Association,

Miami Steamship Association,

Mobile Steamship Association, Inc.,

New Orleans Steamship Association,

J. Ross Dunn, Galveston, Texas,

New Bedford Stevedoring Corporation,

Harbor Carriers of the Port of New York

(Lighterage Division),

Baton Rouge Steamship Association, and

Pensacola Steamship Association

(hereinafter referred to as the "companies"), and

International Longshoremen's Association, AFL-CIO,

Atlantic Coast District, ILA, and

South Atlantic and Gulf Coast District, ILA.

7. (a) Upon the filing of the verified complaint and the accompanying affidavits and exhibits and after due consideration thereof, this Court at 7:05 p. m., Eastern Daylight Time, on October 1, 1968, issued a temporary restraining order as prayed for by the plaintiff, accompanied by a statement defining the injury, why it was irreparable and why it was granted without formal notice.

(b) The restraining order provided that it would expire at 5:00 p. m., Eastern Daylight Time, on October 9, 1968, unless before such time the order should be extended for good cause shown or unless the defendants consented to an extension of the order for a longer period.

8. Copies of the verified complaint, the affidavits annexed thereto, the temporary restraining order and plaintiff's motion for preliminary injunction were duly served upon all of the defendants in this proceeding.

9. Following service of the temporary restraining order the defendant ILA on October 2, 1968, terminated the strike, and the majority of their members returned to their normal employment.

10. Unless the Court grants an injunction, the defendant ILA upon the expiration of said temporary restraining order will resume said strike in the maritime industry from Searsport, Maine, to Brownsville, Texas.

11. The strike by the defendant ILA consisted of a concerted stoppage of work on the part of the said defendant, and did not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act.

12. The strike has affected, and if permitted to resume, will affect a substantial part of the maritime industry of the United States.

13. The maritime industry of the United States is engaged in trade, commerce, transportation, transmission or communication among the several States and with foreign nations.

14. The strike substantially paralyzed the shipping industry from Searsport, Maine, to Brownsville, Texas, and interfered with and delayed shipments from or to other ports of the United States and its territories or possessions, and if permitted to resume would imperil the national health and safety in the following respects:

(a) It will, if permitted to resume, stop transportation provided by offshore shipping to and from foreign ports as well as coastwise, coastal and non-contiguous steamship services even to the extent of closing down trade in all Atlantic and Gulf Coast ports thus materially weakening the national defense efforts. (Gulick affidavit, ¶¶ 3, 7)

(b) It would delay large quantities of commodities for Vietnam scheduled for shipment during the month of October 1968 from Atlantic and Gulf Coast ports, the prompt delivery of which is essential to the United States program of support for that country. (Gaud affidavit ¶ 6)

(c) It would prevent the shipment as scheduled of numerous items financed under the Foreign Assistance Act of 1961, as amended, including machinery (of all kinds), trucks and other vehicles, spare parts, tires, paper goods, chemicals, iron and steel products, non-ferrous metals, insecticides, fertilizers, laboratory equipment, hospital furniture and supplies, electrical power equipment, tractors and parts, wood pulp and bulk commodities, and would adversely affect the foreign assistance programs of the United States which are essential to the foreign policy and to the national defense of the United States. (Gaud affidavit, ¶¶ 5, 8)

(d) It would delay imports of the cargoes of a large number of ships in the several ports and others on the high seas destined for these ports, including such commodities as ores, chemicals, and other raw materials consigned to manufacturers of products necessary for the national defense. (Tierney affidavit, ¶ 6)

(e) It would prevent the handling, storage, and transportation of merchandise normally entering or leaving the ports of the strike which ports in 1967 handled approximately 84% of the total tons exported or imported in the ocean-going foreign trade of the United States in that year. (Gulick affidavit, ¶¶ 5, 6)

(f) It would interrupt delivery of food and other essentials to the City of New York and other major coastal cities, particularly in the Gulf area where economies have been built largely on the ocean-going trade. Commodities scheduled for import include 1,084,000 tons of sugar under established sugar quotas during the period October through December 1968. (Gulick affidavit, ¶ 13; Schnittker affidavit, ¶ 7)

(g) It would adversely affect Puerto Rico which depends in major part upon exports from the continental United States for food supplies. Because of climatic conditions, only a small supply of some of the basic food items can be stored and even a short strike with depletion of food stocks would have a critical effect upon the health of the people of Puerto Rico. (Gulick affidavit, § 14)

(h) It would halt or materially delay aid and defense cargoes under the Government's defense and aid programs to nations receiving economic and military assistance from the United States under programs administered by the Department of Agriculture, Agency for International Development, Bureau of Public Roads, General Services Administration, and the Export-Import Bank, including the scheduled shipment of approximately 2,200,000 long tons of agricultural commodities scheduled for shipment during the period October through December 1968 with resultant detriment to this Government's economic and military programs. (Gulick affidavit, ¶ 15; Schnittker affidavit, ¶ 5)

(i) It would idle an estimated 70,000 longshoremen, cargo repairmen, checkers, clerks and related workers, and if the work stoppage were prolonged would render idle many thousand other workers, including seamen and teamsters. It is estimated that 1,785,000 jobs (approximately 28% of total private employment) are directly or indirectly created by the exports which move through the Atlantic and Gulf ports. (Gulick affidavit ¶¶ 3, 4; McQuade affidavit, ¶ 7)

(j) It would adversely affect foreign and domestic trade to the extent of completely closing down such trade in all Atlantic and Gulf Coast ports, thus materially weakening the national defense effort. This is evident from the fact that in 1967 the United States exported approximately 130 million tons and imported approximately 106 million tons in dry cargo ships and over 74% of such exports and imports move through Atlantic and Gulf Coast ports. Estimated tonnage of principal exports are 31 million tons of coal, 54 million tons of wheat, 35 million tons of corn-maize, 3 million tons of scrap iron and steel, 1 million tons of cotton; estimated tonnage of principal imports were 29 million tons of iron ore, 6 million tons of sugar, 17 million tons of manganese, chromite, and bauxite and 1 million tons of coffee. (Gulick affidavit, ¶¶ 9, 11)

(k) It can result in idling 600 to 800 vessels, development of a national freight rail car shortage and idling elements of the national transportation system which depend on maritime transportation such as railroads, motor carriers and inland freight terminals. (Boyd affidavit, ¶ 4)

(l) It would imperil national safety by rendering inoperative a substantial segment of the merchant marine which is a vital auxiliary to the naval and military forces in time of emergency and could adversely affect our ability to deliver military cargoes to overseas destinations as required to the detriment of national security. (Gulick affidavit, ¶ 16; ¶ 16 Clifford affidavit, ¶¶ 6, 7)

(m) It will have an adverse affect upon the Nation's balance of payments. Under current conditions, the adverse impact upon export surplus would be about 100 million dollars a month. A loss of 1.2 billion dollars at annual rates in our trade surplus would be a serious blow to our balance of payments position. (Okun affidavit, pp. 1, 2; Fowler affidavit, ¶ 7)

(n) It would adversely affect industries which depend upon exports. An estimated 1.3 billion dollars of commodities could not be shipped each month. Industries adversely affected would be

non-electric machinery, sulphur, and paper mill products, each of which sells more than one-fifth of its products abroad. Industries dependent upon imports would also be adversely affected. Losses of exports and imports and the resulting chain reaction on production and employment in many industries from the closing of East and Gulf ports would severely injure the domestic economy. (Okun affidavit, pp. 3 & 4)

(o) It will require embargoes by railroad and other surface transportation, causing disruption and congestion. Approximately 25,724 car loads of general and bulk cargo were on hand at the Atlantic and Gulf ports ready for further movement by water and arrivals approximate 4,476 cars per day. (Tierney affidavit, ¶ 4)

(p) It will adversely affect the Nation's ability to sustain the level of expenditures now being made abroad for the common security to the extent that the overall balance of payments position is adversely affected. (Fowler affidavit, ¶ 10)

15. Such results, if the strike is permitted to resume or to continue, would imperil the national health and safety and thereby cause irreparable damage and injury to the United States of America, for which there is no adequate remedy at law.

## CONCLUSIONS OF LAW

1. This action was properly instituted under the National Emergencies provisions of the Labor-Management Relations Act, 1947, Sections 206–210 (29 U.S.C. §§ 176–180).

2. The statutory provisions of Section 206 to 208 of the Act and all requirements therein contained, were in all respects duly and legally complied with, both prior to and in the commencement of this suit by the United States of America.

3. The Court has jurisdiction of the subject matter of this suit and of the parties.

4. The work stoppage was a strike on the part of the ILA and did not constitute the exercise of the right of individual employees to quit their labor, as set forth in Section 502 of the Act.

5. The strike is one affecting a substantial part of an industry engaged in trade and commerce, transportation, transmission and communication among the several States and with foreign nations as well as between the United States and certain of its territories or possessions.

6. The strike, if permitted to continue or to be resumed, will imperil the national health and safety, and thereby cause irreparable injury to the United States of America, for which there is no adequate remedy at law.

7. Plaintiff, the United States of America, is entitled to the relief prayed for.

## PRELIMINARY INJUNCTION

This cause having come on for hearing on the 9th day of October, 1968, on plaintiff's motion for a preliminary injunction pursuant to Section 208 of the Labor Management Relations Act, 1947 (29 U.S.C. § 178), and the Court having considered the evidence submitted herein, the pleadings, memoranda of law, and argument of counsel, and the Court having simultaneously herewith made Findings of Fact and Conclusions of Law:

Now, therefore, it is this 16th day of October, 1968, ordered:

(1) That the defendants and each of them and their officers, agents, servants and employees and all persons in active concert or participation with them be and they hereby are restrained:

(a) From in any manner continuing, encouraging, ordering, aiding, engaging in or taking any part in any strike or lock-out in the maritime industry of the United States, and

(b) from in any manner interfering with or affecting the orderly continuance of work in said industry at the same rates of pay, hours of labor, and

other terms and conditions of employment in effect immediately prior to October 1, 1968, subject to such modifications thereof as the defendants may agree upon, and from taking any action which would interfere with this Court's jurisdiction in the premises.

(2) That the members of the defendants International Longshoremen's Association, AFL–CIO, Atlantic Coast District, ILA, and South Atlantic and Gulf Coast District, ILA, acting in concert, be and they hereby are enjoined from in any manner continuing, encouraging, ordering, aiding, engaging in or taking any part in any strike or lock-out in the maritime industry of the United States and from in any manner interfering with or affecting the orderly continuance of work in said industry and from taking any action which would interfere with this Court's jurisdiction in the premises; provided, however, that nothing in this paragraph shall be construed to require an individual to render labor or services without his consent, nor to make the quitting of his labor or service by an individual employee an illegal act.

(3) That the defendants, International Longshoremen's Association, AFL–CIO, Atlantic Coast District, ILA, and South Atlantic and Gulf Coast District, ILA, and their respective appropriate officers, agents, servants and employees be and they hereby are directed:

(a) To instruct immediately all of their members employed in the maritime industry of the United States to continue their normal employment;

(b) to give notice forthwith to their members of the terms of this order by posting a copy of said order at the Headquarters of said International Longshoremen's Association and the Headquarters of said Atlantic Coast District, ILA, at 17 Battery Place, New York, New York, and the Headquarters of said South Atlantic and Gulf Coast District, ILA, at Marine Building, Galveston, Texas, and said posting will be deemed to constitute notice of said order to all members of said International Longshoremen's Association, AFL–CIO;

(c) to take all action which may be necessary to insure that such instructions are carried out.

(4) That the defendants are directed to engage in free collective bargaining in good faith for the purpose of resolving their disputes and to make every effort to adjust and settle their differences.

(5) This injunction shall remain in full force and effect until the further order of this court.

### Opinion

This suit was filed by the United States of America to enjoin a strike by defendant unions which commenced on October 1, 1968 on the ground that it threatened the national safety and health.[1] LMRA 1947, 29 U.S.C.A. §§ 176–178. On October 1, 1968, plaintiff sought and obtained a temporary restraining order pending a hearing on the entry of an interlocutory injunction. Rule 65(b), F.R.C.P. The order was by its terms to expire on October 9, 1968 and, on that day, a hearing on the temporary injunction was held, at which all the parties were heard and affidavits and briefs submitted.

None of the parties offered oral testimony or sought to examine any person whose affidavit was submitted. It has been stipulated that, if any Government officials, whose affidavit was presented in support of the plaintiff's application for an injunction were called as witnesses they would testify as set forth in their respective affidavits. This same stipulation also provides that, if Thomas W. Gleason, President of International

---

1. The strike centers around 2 principal issues—unionwide collective bargaining and the effect of containerization—which the unions fear will substantially reduce the earnings and employment opportunities of its members. Efforts of the Federal Mediation and Conciliation Service for the past two months to resolve the dispute between the parties have been unavailing.

Longshoremen's Association, AFL–CIO, were called as a witness in opposition to this application, he would testify as set forth in his affidavit, verified October 8, 1968. I have read all affidavits and considered them in light of this stipulation.

While the Government seeks a preliminary injunction on the continued threat to national safety and health, the Union seeks an order vacating the temporary restraining order and denying injunctive relief on two grounds: the failure of plaintiff to comply with the statute in obtaining the temporary restraining order, i. e. a hearing and report by the Board of Inquiry on the facts and positions of the parties, and the failure of plaintiff to show likelihood of the statutory injury to the nation from the strike.

█ Defendant Unions' first argument is that the speed with which the Board was convened, held a hearing and made its report—conditions precedent to the Department of Justice's seeking of the restraining order violated the statute, in that the Unions had no opportunity to present to the Board the status of negotiations and the issues involved.

I find that the Board was convened and reported in full compliance with the statute. Because of the finding of imminent threat to the national safety and health presented by the strike which had been announced to commence on October 1, 1968 at 12.01 A.M., the President of the United States on September 30, 1968 created and directed the Board of Inquiry to inquire into and report on the issues involved in the labor dispute. (Sec. 206 LMRA, Sec. 176, 29 U.S.C.A.); the Board convened at 9.30 A.M. on October 1, 1968, 10 hours after the strike had begun as announced—as conceded by Defendant Unions—and proceeded to hold a hearing after notification to the principal labor and management representatives; it was assisted by the Federal Mediation and Conciliation Service, a body expert in the field of labor negotiations that had been working with the parties for two months on the present dispute. At the hearing appeared Thomas W. Gleason, the President of the Union, and his counsel, and the counsel and Executive Director of the New York Shipping Association, Inc.; they were heard and presented exhibits on their respective positions and the issues. The Board found that the exhibits spelled out in considerable detail the differences between the parties. There was a transcript made of the proceedings. The hearing was concluded at 11.45 A.M. and the restraining order issued at 7.05 that night. It is clear from a reading of the Report of the Board to the President that it (the Board) was thoroughly familiar with the problems underlying the strike. It reported that the strike was effectively tying up all ports on the Atlantic and Gulf Coasts from Maine to Texas, and that the costs to the New York Port alone approximated $1.3 million a day. It is difficult to understand what further extended hearings would have developed unless it was a detailed finding of the extent and nature of the injury resulting from the strike. As the Board pointed out, the national emergency had already been found to exist by the President's Executive Order; it found nothing to dispel that opinion.

█ The President's finding is, of course, entitled to great weight but, in addition, the disastrous effect which a continued strike would have on the national health and safety and in all aspects of its economic and military activities was demonstrated by the affidavits which were submitted on this question. These were affidavits of responsible Government officials, whose knowledge and experience in the particular Government activity affected by the strike was not questioned. These were affidavits of the following men: Acting Maritime Administrator of the Department of Commerce; Under Secretary of Agriculture; Acting Secretary of Commerce; Chairman of the Interstate Commerce Commission; Administrator of the Agency for International Development; Secretary of Transportation; Secretary

of Defense; and Chairman of the Council of Economic Advisers. In my Findings Of Fact, I have cited these affidavits; there is no need to discuss their contents other than to point out that they disclosed that the resultant injury to the nation would touch its national defense, its foreign economic and military aid, the health of its citizens, the jobs of well over a million citizens; its entire transportation system, including trucks and railroads; dealing a serious blow to its domestic and foreign economy and causing inestimable pecuniary loss to all affected. Nor were their dire predictions the result of intelligent surmise; they were based on experience of the prior strikes in which this Union had engaged, going as far back as 1956. The only affidavits submitted in opposition by defendant Union on this aspect were those of its president, who characterized the resultant injury to the nation from a short-lived strike as "de minimis". Such optimism is not supported by the statistics of its prior strikes.

The Attorney General has submitted a set of proposed Findings of Fact and Conclusions of Law, and a proposed form of preliminary injunction order. I have accepted these as supported by the evidence before me. I file them herewith as the Court's Findings and Conclusions. I have signed the preliminary injunction order.

The defendant steamship and shipping companies have consented to the entry of the preliminary injunction order in the form proposed by the Government.

█ I find the order as signed will maintain the status quo of relations between labor and employers. It will continue in effect the "same rates of pay, hours of labor, and other terms and conditions of employment in effect immediately prior to October 1, 1968 * * *". I agree with the position taken by the International Longshoremen's Association that "Simple fairness dictates that this Court order the employers to maintain the same terms and conditions of employment until the parties agree oth-

erwise through collective bargaining." This is accomplished by the order signed and follows a pattern heretofore adopted by the parties and this Court.

The International Longshoremen's Association has asked that provision be made in the order providing that, if money adjustments are later agreed to, then they should be paid by the employers on a retroactive basis. Such a provision, I find, goes beyond the intendment of Section 208 LMRA (29 U.S.C. § 178) or the power of the Court, and would interfere with free bargaining. The agreements ultimately reached have in the past provided for various effective dates for different improvements in benefits.